

# In the
# Missouri Court of Appeals
# Western District

| | | |
|---|---|---|
| WESTON URBANIAK, | ) | |
| | ) | |
| Appellant, | ) | **WD84569** |
| | ) | |
| v. | ) | **OPINION FILED: September 6, 2022** |
| | ) | |
| DIRECTOR OF REVENUE, | ) | |
| | ) | |
| Respondent. | ) | |

**Appeal from the Circuit Court of Jackson County, Missouri**
The Honorable Kyndra James Stockdale, Judge

Before Special Division: Gary D. Witt, Chief Judge, Presiding, Thomas N. Chapman, Judge, and Zel Fischer, Special Judge

Weston Urbaniak ("Urbaniak") appeals the judgment of the Circuit Court of Jackson County, Missouri ("trial court") affirming the decision of the Director of Revenue to sanction Urbaniak's driving privilege pursuant to the provisions of section 302.574.[1] On appeal, Urbaniak claims the trial court's judgment is in error in that it is against the weight of the evidence because, viewed correctly, the evidence establishes that there was no

---

[1] All statutory references are to Revised Statutes of Missouri (2016), as currently updated by supplement, unless otherwise indicated.

probable cause for the officer to believe that Urbaniak was driving under the influence of alcohol. We affirm the judgment of the trial court.

## Factual and Procedural Background[2]

On August 20, 2020, Urbaniak was stopped for speeding for driving 64 miles per hour in a 40-mile-per-hour zone by Deputy S. Stoff of the Jackson County, Missouri, Sherriff's Department ("Deputy Stoff"). During the stop, Urbaniak told the officer he believed that the speed limit was fifty-five miles per hour and he was in a hurry to get home. Deputy Stoff noted that Urbaniak's eyes were bloodshot and glassy, and he noticed a moderate odor of intoxicants and the odor of burnt marijuana. Urbaniak stated that he was coming from a friend's house where he had consumed "a couple of beers" with his last beer being "about forty-five minutes ago." Deputy Stoff patted down Urbaniak for safety and felt a large round object in Urbaniak's front pants pocket, which Urbaniak reported was marijuana. Urbaniak reported that he had last smoked marijuana "a while ago."

Deputy Stoff conducted the three Standardized Field Sobriety Tests ("SFST"). First, he performed the Horizontal Gaze Nystagmus test ("HGN") and observed a lack of smooth pursuit in both eyes and distinct and sustained nystagmus at maximum deviation. Urbaniak also swayed during the test, and Deputy Stoff noticed the odor of intoxicants was stronger while Urbaniak was standing in front of him than he previously noted. Deputy Stoff then conducted the walk-and-turn test, and observed that Urbaniak failed to touch heel-to-toe on his first two steps, lost balance while walking, and used his arms for balance. Next

---

[2] We view the evidence in the light most favorable to the trial court's judgment. *Collier v. Dir. of Revenue,* 603 S.W.3d 714, 715 n.1 (Mo. App. W.D. 2020).

Deputy Stoff requested Urbaniak perform the one-leg-stand test. During the performance of this test Urbaniak swayed while balancing but no other clues of intoxication were observed. Urbaniak refused to submit to a preliminary breath test. Based on the totality of the circumstances, his observations of impaired driving, the smell of intoxicants emitting from within the driver's compartment and Urbaniak's own breath, Urbaniak's admission to having consumed intoxicants, and his observations of Urbaniak's impairment while performing the SFSTs, Deputy Stoff placed Urbaniak under arrest for driving while intoxicated.

Deputy Stoff advised Urbaniak of Missouri's Implied Consent law and requested that he submit to a chemical test of his breath.[3] After several unsuccessful attempts to contact an attorney, Urbaniak refused to consent to a chemical test of his breath. Urbaniak received two tickets, one for speeding and one for driving while intoxicated, and was served with a notice of revocation of his license based upon his refusal to submit to a breath analysis test.

Urbaniak timely filed a petition to review the refusal sanction, and on April 22, 2021, a hearing was held in the Circuit Court. The Director offered its Certified File, which was received into evidence without objection, and rested. Urbaniak offered into evidence, without objection, the Impairment Clue Charts of the National Highway Traffic Safety Administration ("NHTSA") relating to driving and stopping and to personal contact

---

[3] Pursuant to Section 577.020.1 RSMo (2016), any person who operates a vehicle in the state "shall be deemed to have given consent ... to a chemical test or tests of the person's breath, blood, saliva, or urine for the purpose of determining the alcohol or drug content of the person's blood ..."

between an officer and driver in a DWI stop. Urbaniak also offered evidence, without objection, that the NHTSA had found the HGN test, by itself if properly administered, to be seventy-seven percent accurate; the walk-and-turn test, by itself if properly administered, to be sixty-eight percent accurate; and the one-leg-stand test, by itself if properly administered, to be sixty-five percent accurate in determining that a subject will have a blood alcohol concentration of over .08. Urbaniak also offered a copy of the dash-camera and in-car video surrounding his arrest.

The trial court took the matter under advisement, and on April 26, 2021, issued a judgment affirming the Director's decision. This appeal follows.

**Standard of Review**

"[T]rial court judgments in driver's license suspension and revocation cases under section 302.535 are reviewed as any court-tried civil case." *White v. Dir. of Revenue*, 321 S.W.3d 298, 307 (Mo. banc 2010). "[T]he trial court's judgment will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Id.* at 307-08. A trial court's judgment is against the weight of the evidence "only if the [trial] court could not have reasonably found, from the record at trial, the existence of a fact that is necessary to sustain the judgment." *Ivie v. Smith*, 439 S.W.3d 189, 206 (Mo. banc 2014). "To set aside a judgment as 'against the weight of the evidence,' this Court must have a firm belief that the judgment is wrong." *White*, 321 S.W.3d at 308.

4

A party raising an against-the-weight-of-the-evidence challenge must follow the four-step analytical sequence for raising such a challenge as set forth in *Houston v. Crider,* 317 S.W.3d 178, 187 (Mo. App. S.D. 2010):

> (1) identify a challenged factual proposition, the existence of which is necessary to sustain the judgment;
> (2) identify all the favorable evidence in the record supporting the existence of that proposition;
> (3) identify the evidence in the record contrary to the belief of that proposition, resolving all conflicts in testimony in accordance with the trial court's credibility determinations, whether explicit or implicit; and,
> (4) demonstrate why the favorable evidence, along with the reasonable inferences drawn from that evidence, is so lacking in probative value, when considered in the context of the totality of the evidence, that it fails to induce belief in that proposition.

*Meseberg v. Meseberg,* 580 S.W.3d 59, 66 (Mo. App. W.D. 2019).

## Analysis

Urbaniak's single point on appeal is that the trial court's judgment was against the weight of the evidence in that, when properly viewed, the evidence does not support a conclusion that Deputy Stoff had probable cause to believe that Urbaniak was driving while intoxicated at the time of his arrest.

Section 302.574.3 establishes Missouri's implied consent law, which provides that drivers, in exchange for their privilege to drive a vehicle on the roadways of the state, consent to a chemical test of their breath when an officer has reasonable grounds to believe that the driver is driving while intoxicated; it authorizes the Director to revoke a driver's license for one year for refusing to submit to a chemical test. *State v. Reeter*, 582 S.W.3d 913, 916 (Mo. App. W.D. 2019); section 302.574. If the driver refuses to submit to a

5

chemical test and faces revocation, he may file a petition for review in the circuit court.

Section 302.574.4. The only issues at the hearing will be: "(1) Whether the person was arrested or stopped; (2) Whether the officer had; (a) Reasonable grounds to believe that the person was driving a motor vehicle while in an intoxicated or drugged condition;. . . and (3) Whether the person refused to submit to the test." *Id.* "Reasonable grounds [for purposes of section 302.574] is virtually synonymous with probable cause." *White*, 321 S.W.3d at 305 n.6. Urbaniak concedes that he was arrested and that he refused to submit to the chemical test. This appeal focuses solely on whether the officer had reasonable grounds to believe Urbaniak was intoxicated while driving a motor vehicle.

Deputy Stoff concluded that there were reasonable grounds to arrest Urbaniak for driving while intoxicated as set forth in his report:

> Based on the totality of the circumstances, my observation of impaired driving, the smell of intoxicants emitting from within the driver's compartment and his own breath, Urbaniak's own admission to consuming intoxicants, and my observation of impairment during the field sobriety test, I placed Urbaniak in custody for driving while intoxicated.

Urbaniak takes issue with the above evidence in several respects. First, Urbaniak acknowledges that speeding is a valid basis for stopping a vehicle but argues that exceeding the speed limit by driving sixty-four miles per hour in a forty-mile-per-hour zone is not proper support for reasonable grounds of impairment because the NHTSA's vehicle in motion impairment clues do not include excessive speed.

Since the mid-1970s, the International Association of Chiefs of Police ("IACP") and the National Highway Traffic Safety Administration ("NHTSA"), in conjunction with additional law enforcement agencies, have conducted extensive research in detection of

impaired drivers. *State v. Browning,* 458 S.W.3d 418, 424-425 (Mo. App. W.D. 2015) (Witt, J., concurring). That research has identified three phases to DWI detection. According to the NHTSA manual, Phase One is Vehicle In Motion, Phase Two is Personal Contact, and Phase Three is Pre-arrest Screening. *DWI Detection & Standardized Field Sobriety Testing Manual,* Sec. 4 p. 5 (NHTSA 2018 ed.)("NHTSA Manual").

Under Phase I, NHTSA sponsored research to identify the most common and reliable initial indicators of possible impairment during the observation of the operation and stop of the vehicle. *Id.* Speeding is not listed as one of the clues identified by NHTSA as a common and reliable initial indicator of possible impairment.[4] Speeding was the only item Deputy Stoff indicated he observed regarding Urbaniak's driving and therefore Urbaniak takes issue with the Deputy's conclusion that he based his arrest decision on "my observation of impaired driving." While speeding, without more, is not an indication of possible impaired driving, Urbaniak cites to no authority stating that at least one of the factors on the NHTSA's list of possible impairment clues must be present in determining reasonable grounds, and we find none. On the contrary, the NHTSA Manual points out that an officer can proceed to Phase II even without Phase I, noting this occurs regularly at checkpoints or the scene of an accident, where the officer has no significant opportunity to observe the driver's operation of the vehicle. *Id.*, Sec. 6 p. 4. Further, Missouri courts have recognized speeding may support a finding of reasonable grounds when considered with other facts. *See, e.g., State v. Burks*, 373 S.W.3d 1, 3 (Mo. App. S.D. 2012); *State v.*

---

[4] Varying speed or driving more than ten miles per hour *under* the speed limit are indicators of possible impairment under Phase I. *NHTSA Manual* Sec. 5 p. 10.

7

*Browning*, 458 S.W.3d 418, 420 (Mo. App. W.D. 2015). Urbaniak argues that, according to the officer's incident report, Urbaniak exhibited none of the clues of impairment while he was driving or during the stop of his vehicle. But Urbaniak cites to no authority that the initial stop for speeding must be supported by reasonable grounds to believe that the driver was intoxicated, only that there were reasonable grounds to believe that the driver was intoxicated at the time of the arrest. Certainly, the lack of clues of impairment during the operation and the stop of the vehicle may be considered as exculpatory in the determination of reasonable grounds, but the lack of clues of impairment during Phase I is not conclusive of that determination. Deputy Stoff's report indicates he considered other observations during the course of the stop that supported his opinion that there were reasonable grounds to believe that Urbaniak was driving while intoxicated such that his arrest was warranted.

Next, Urbaniak notes that he did not exhibit many of the clues of possible impairment during Phase II of the stop, Deputy Stoff's personal contact with Urbaniak. Urbaniak acknowledges that the officer lists five clues of impairment: bloodshot eyes, admission of drinking, the presence of marijuana, the odor of alcohol and the odor of burnt marijuana. Urbaniak argues that the lack of evidence of any of the remaining twenty-seven of the thirty-two clues identified by NHTSA as evidence of possible impairment establishes a lack of impairment. Specifically, he points out that he did not slur or mumble, he was not confused, and he was not incoherent in conversation and argues these are all indicators that he was not impaired. Here again, Urbaniak cites to no authority that all or a majority of clues of impairment must be observed to support a determination of reasonable grounds. Deputy Stoff noticed both a moderate odor of intoxicants and burnt marijuana, and

8

Urbaniak admitted to having fairly recently consumed "a couple of beers" and also to having smoked marijuana earlier in the day. Further, he had marijuana in his possession. Admission of having used intoxicating substances is a factor that can be considered in making a reasonable grounds determination. *Burks*, 373 S.W.3d at 3; *Browning*, 458 S.W.3d at 420. Again, the lack of clues of impairment may be considered as exculpatory in making the reasonable grounds determination, but the lack of these clues does not require a finding that the officer lacked reasonable grounds. We defer to the trial court as to the credibility of the evidence.

Finally, Urbaniak takes issue with the field sobriety tests conducted, challenging both the reliability of the tests in general and the extent to which the tests, as conducted, support a finding of reasonable grounds. Urbaniak did not object to the results of the SFSTs coming into evidence, so his argument is limited to the persuasive value of the results of the tests. The three SFSTs given to Urbaniak were the HGN, walk-and-turn, and one-leg-stand tests. These three SFSTs are identified by NHTSA as the only scientifically validated and reliable method for discriminating between impaired and unimpaired drivers, if the tests are administered properly by an adequately trained officer. *NHTSA Manual*, Sec. 8 p. 13. The NHTSA notes that the studies of the SFSTs validation only apply when: 1) "the tests are administered in the prescribed, standardized manner," 2) "the standardized clues are used to assess the subject's performance," and 3) "the standardized criteria are employed to interpret that performance." *NHTSA Manual,* Sec. 8 p.17. "If any one of the SFST elements is changed, the validity [of the results] may be compromised." *Id.*

9

The first test performed was the HGN test. The HGN test looks for nystagmus, or an involuntary jerking of the eye, and has six possible clues of intoxication, three clues for each eye. *NHTSA Manual,* Sec. 8 p.17. The first clue is a lack of smooth pursuit as the stimulus is passed across the eyes. *Id.* The second clue is distinct and sustained nystagmus at maximum deviation, when the eyes are as far to the side as possible. *Id.* The third clue is the onset of nystagmus prior to 45 degrees with some white of the eye showing. *Id.* On page one of Deputy Stoff's alcohol influence report ("AIR") three boxes were checked for the possible six clues. A finding of four or more clues indicates the subject's blood alcohol concentration is above .08 pursuant to the NHTSA standards. Deputy Stoff marked the boxes for the second clue (distinct and sustained nystagmus at maximum deviation) for each eye, and the first clue (no smooth pursuit) he marked the box for the left eye only. This would indicate that the results of HGN test were not an indicator that Urbaniak had a blood alcohol concentration above .08. The narrative part of the AIR indicates:

> I explained the Horizontal Gaze Nystagmus test and observed the following indicators of impairment. I observed Urbaniak's eyes to equally track, pupils were of equal size and no resting nystagmus was detected. I observed a lack of smooth pursuit in both eyes, distinct and sustained nystagmus at maximum deviation. I also observed a lack of convergence in his left eye.

This statement is concerning because lack of equal tracking of the eyes, pupils of unequal size and the presence of resting nystagmus are not clues of intoxication. *Browning*, 458 S.W.3d at 427-28 (Witt, J., concurring). These are instead indicators of an injury or other physical condition that may call into question whether the HGN test should be administered to a particular subject. *NHTSA Manual*, Sec. 8 p. 25-28. The fact that Urbaniak did not exhibit these three traits is only indicative that there was no evidence of

10

an injury or physical condition that could make him an improper candidate for the administration of the HGN test. The deputy's statement that these are indicators of impairment is improper. *Id.*

The statement above from the narrative portion of the report also differs from the first page of the AIR as to the HGN test because the narrative indicates he observed the first and second clues in both eyes for a total of four clues, which would indicate the HGN test results were consistent with Urbaniak having a blood alcohol concentration above .08. *NHTSA Manual*, Sec 8 p.37. The narrative portion of the AIR also indicates that Urbaniak swayed while performing the HGN test. The police car video of the performance of the HGN test does not show Urbaniak's eyes so the presence of each clue cannot be determined from the video. Consistent with the circuit court's judgment, we presume that the court found the narrative in the Alcohol Influence Report to be accurate, and that the court found that Deputy Stoff observed *four* clues of intoxication on performing the HGN test, despite the fact that only three check marks appear on the report's cover page. *See* Rule 73.01.

The walk-and-turn test is a divided attention test with two stages, the instruction stage and the walking stage. *NHTSA Manual*, Sec. 8 p. 61-70. The instruction stage requires the subject to stand with his feet in a heel-to-toe position, keep his arms at his sides, and listen to the instructions. *Id.* This stage divides the attention between maintaining balance while in the heel-to-toe stance and listening and processing the instructions. *Id.* The walking stage requires the subject to take nine heel-to-toe steps, turn in a prescribed manner, and take nine heel-to-toe steps coming back. *Id.* The subject is instructed to count the steps out loud, keep his eyes on his feet and, during the turn, to keep

11

his front foot on the line and turn with his other foot, taking several small steps to complete the turn. *Id.* This stage divides the subject's attention between maintaining balance while walking and turning, counting out loud, and short-term memory task of recalling the number of steps and the turning instructions. *Id.*

There are eight possible clues of impairment in the walk-and-turn test. 1) failed to maintain heel-to-toe stance[5]; 2) starts too soon, walking before being informed to do so; 3) stops while walking; 4) doesn't touch heel-to-toe;[6] 5) steps off line;[7] 6) uses arms to balance;[8] 7) loses balance on turn or turns incorrectly; and 8) takes the incorrect number of steps. *Id.* If the subject exhibits two or more clues or cannot complete the test, it is an indicator that the subject is intoxicated. *Id.* Inability to complete the test occurs when the subject steps off the line three or more times, or is in danger of falling. Deputy Stoff's AIR indicates that Urbaniak exhibited four clues, including: 1) failed to maintain heel-to-toe stance, 4) didn't touch heel-to-toe on two of the steps, 5) stepped off line, and 6) used his arms to balance. The patrol car video shows the performance of this test, but Urbaniak is only visible from the waist up, and his feet are not within the frame of the video. Four clues on this test indicates intoxication. *Id.*

---

[5] This clue should not be recorded unless the subject's feet actually break apart or step off the line and should not be recorded if the subject sways or uses the arms to balance but maintains the heel-to-toe position. *NHTSA Manual*, Sec. 8 p.66.

[6] This clue should not be recorded unless the subject leaves more than 1/2 inch of space between the heel and toe on a step. *NHTSA Manual*, Sec. 8 p.67.

[7] The subject's foot must be entirely off the line before this clue should be counted. *NHTSA Manual*, Sec. 8 p.68.

[8] This clue should not be recorded unless the subject raises one or both arms more than six inches away from his/her sides for balance. *NHTSA Manual,* Sec. 8 p.68.

12

The final SFST given to Urbaniak was the one-leg-stand test. *NHTSA Manual*, Sec. 8 p. 72-88. This test is also a divided attention test with an instruction stage and a balance and counting stage. *Id.* During the instruction stage the subject is told to stand with feet together with his arms at his sides and listen to the instructions. *Id.* The instruction stage divides the attention between maintaining balance while in the stance and listening and processing the instructions. *Id.* The balance-and-counting stage requires the subject to raise one foot off of the ground approximately six inches, keep the raised foot parallel to the ground, and keep his eyes on the raised foot. *Id.* The subject is also instructed to count out loud "one thousand one," "one thousand two," "one thousand three," etc., until told to stop. *Id.* The subject's attention is divided between remembering and following the instructions, maintaining balance while standing on one foot, and counting out loud in the prescribed manner. The officer times the test for 30 seconds. *Id.*

During this test the officer is looking for four specific clues, which are indicative of intoxication, including; 1) sways while balancing, 2) uses arms to balance,[9] 3) hops, and 4) puts foot down. A finding of two or more clues or the inability to complete the test is an indication that the subjects blood alcohol level is above .08. Inability to complete the test occurs when the subject puts his foot down three or more times. Deputy Stoff only noted one clue, 1) sways while balancing. This result is not indicative of intoxication. *Id.*

Urbaniak argues that it is significant that the NHTSA has found the HGN test, by itself, to be only seventy-seven percent accurate at determining a blood alcohol level above

_____

[9] If the subject moves one or both arms six inches or more from the side of the body is sufficient to record this clue. *NHTSA Manual* Sec. 8 p. 77.

13

.08, that the walk-and-turn test, by itself, is only sixty-eight percent accurate at determining a blood alcohol level above .08, and that the one-leg-stand test, by itself, is only sixty-five percent accurate at determining a blood alcohol level above .08. *NHTSA Manual*, Sec. 8 p. 8. The implication of his argument is that these tests are inherently unreliable as indicators of intoxication and should not have been considered. However, the question in this case is reasonable grounds, not proof beyond a reasonable doubt, and Urbaniak focuses on each test in isolation and ignores that the trial court may have found there to be increased persuasiveness as a result of the combined performance on all three tests. "There is a vast gulf between the quantum of information necessary to establish probable cause and the quantum of evidence required to prove guilt beyond a reasonable doubt." *White*, 321 S.W.3d at 309

"[T]he evidence and reasonable inferences drawn therefrom are viewed in the light most favorable to the trial court's judgment." *Boggs*, 564 S.W.3d at 697. The trial court affirmed the Director's revocation of Urbaniak's driving privileges; therefore, we can infer that the trial court resolved any inconsistencies in the evidence in favor of a finding of reasonable grounds to believe that Urbaniak was intoxicated. *Id.* In addition to the four-point score on the HGN test, Deputy Stoff considered that Urbaniak swayed while he took the test and confirmed that the odor of intoxicants he noticed when he first approached Urbaniak's vehicle was then determined to be coming from Urbaniak's person. Deputy Stoff also considered the results of the three SFSTs in conjunction with each other and with his other observations. Urbaniak cites no evidence that each test independently must support a finding of probable cause. In fact, "[a]n officer may develop probable cause to

14

arrest an individual for driving while intoxicated absent any field sobriety tests at all." *Gannon v. Dir. of Revenue*, 411 S.W.3d 394, 398 (Mo. App. E.D. 2013). In this case, all of the observations Deputy Stoff made before and during the SFSTs he conducted, Urbaniak's admissions to having consumed intoxicants, both alcohol and marijuana, and his possession of marijuana on his person, support Deputy Stoff's determination of reasonable grounds and the trial court's affirmation of that finding. And although we would not have reversed a judgment by the trial court finding a *lack* of reasonable grounds under these facts as against the weight of the evidence, we also cannot conclude that the trial court's finding that reasonable grounds existed is against the weight of the evidence. "When the evidence poses two reasonable but different conclusions, appellate courts must defer to the circuit court's assessment of that evidence." *Ivie v. Smith*, 439 S.W.3d 189, 206 (Mo. banc 2014). We do not find the trial court's judgment was against the weight of the evidence.

## Conclusion

For all of the above-stated reasons, we affirm the judgment of the trial court.

_____
Gary D. Witt, Judge

All concur

15